## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## Judge Nina Y. Wang

Civil Action No. 24-cv-01861-NYW-TPO

SEMAHO, INC.,

     Plaintiff,

v.

AMCO INSURANCE COMPANY,

     Defendant.

---

### MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Plaintiff's Cross-Motion for Partial Summary Judgment Pursuant to F.R.C.P. 56 ("Plaintiff's Cross-Motion"), [Doc. 27], and Defendant's Cross-Motion for Summary Judgment ("Defendant's Cross-Motion") (together, the "Cross-Motions"), [Doc. 28]. Both Cross-Motions are fully briefed and ripe for disposition. [Doc. 36; Doc. 37; Doc. 42; Doc. 43]. The Court concludes that oral argument would not materially assist in the resolution of the Cross-Motions. For the reasons set forth below, Plaintiff's Cross-Motion is respectfully **GRANTED**, and Defendant's Cross-Motion is respectfully **GRANTED in part** and **DENIED in part**.

### BACKGROUND

Plaintiff Semaho, Inc. ("Plaintiff" or "Semaho") owns two commercial buildings insured under a policy issued by Defendant AMCO Insurance Company ("Defendant" or "AMCO"). [Doc. 3 at ¶ 4]. The buildings' roofs were damaged in a windstorm, and Semaho's contractor stored the building materials for the repairs on one building's roof. [*Id.* at ¶ 5]. A second windstorm then seriously damaged the building materials. [*Id.* at

¶ 6].    Semaho submitted a claim for the lost building materials, and coverage is undisputed.  [Doc. 27 at 6; Doc. 37 at 12; Doc. 27-8].  But the Parties disagree over what deductible should apply to Semaho's claim.   The key policy provision states that the deductible should be calculated separately for the "building" and for certain categories of "personal property," based on the "the value(s) of the property that has sustained loss or damage."  [Doc. 28-1 at 161–62].  Broadly, Semaho contends that the building materials are "personal property" within the plain meaning of the term, so the deductible should be calculated based on the value of the lost building materials.  [Doc. 27; Doc. 36].  AMCO counters that the building materials are only covered pursuant to the coverage on the building, so the building is the property that sustained the loss, and the deductible should be calculated using the value of the building.  [Doc. 28; Doc. 37].

Due to the dispute over the deductible, AMCO has not issued any payments to Semaho for the lost building materials.  [Doc. 28 at ¶ 17; Doc. 36 at ¶ 17].  Semaho thus brings claims for (1) breach of contract; (2) bad faith breach of insurance contract (the "common law bad faith" claim); and (3) unreasonable delay or denial of benefits under Colo. Rev. Stat. §§ 10-3-1115 and -1116 (the "statutory bad faith" claim).  [Doc. 3 at ¶¶ 12–28].  Both Parties now seek summary judgment on the breach of contract claim, asking the Court to adopt their interpretation of the policy provisions relevant to calculating the deductible.  [Doc. 27; Doc. 28 at 11–14].  AMCO also moves for summary judgment on the bad faith claims.  [Doc. 28 at 14–19].

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). The denial of one cross-motion does not require the grant of the other. *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). In considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

Although cross-motions for summary judgment are held to the same standard, this standard applies differently depending on whether the movant bears the burden of persuasion at trial. A movant that does not bear the burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). To satisfy this burden, the nonmovant must point to competent

summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

However, "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

## UNDISPUTED MATERIAL FACTS

1.      Semaho owns two commercial buildings ("Views 1" and "Views 2") in Broomfield, Colorado.  [Doc. 27 at ¶ 1; Doc. 37 at ¶ 1; Doc. 3 at ¶ 4].

2.      Views 1 and Views 2 were insured under a policy issued by AMCO, Policy No. ACP COPA 3100463843 (the "Policy"), with effective dates of January 1, 2023 to January 1, 2024.  [Doc. 27 at ¶ 1; Doc. 37 at ¶ 1; Doc. 28-1 at 39–40].

3.      A severe windstorm damaged the roofs of Views 1 and Views 2 in December 2021.  [Doc. 27 at ¶ 2; Doc. 37 at ¶ 2; Doc. 27-2].

4.      Semaho hired a contractor to repair the damage, and the contractor stored the materials for the repairs on the roof of Views 1 while repair work was underway.  [Doc. 27 at ¶¶ 4–5; Doc. 37 at ¶¶ 4–5; Doc. 27-4; Doc. 27-5].

5.      Before the repairs were complete, a second windstorm occurred in March 2023.  All or nearly all of the roofing materials stored on the Views 1 roof were lost or damaged.  [Doc. 27 at ¶ 6; Doc. 37 at ¶ 6; Doc. 27-5; Doc. 27-6].

6.      Semaho submitted a claim to AMCO under the Policy for the lost roofing materials.  [Doc. 27 at ¶ 11; Doc. 37 at ¶ 11; Doc. 27-8; Doc. 3 at ¶ 7].

7.      AMCO accepted the claim but indicated that it disagreed with Semaho as to what deductible should apply.  [Doc. 27 at ¶ 11; Doc. 37 at ¶ 11; Doc. 27-8].

8.      Views 1 and Views 2 each have an agreed value of $22 million for Building Coverage under the Policy.  [Doc. 28 at ¶ 5; Doc. 36 at ¶ 5; Doc. 28-1 at 33].

9.      Section A.1 of the Policy's Coverage provision (or "Covered Property Provision") states:

**A.      Coverage**

We will pay for direct physical loss of or damage to Covered Property at "covered locations" caused by or resulting from any Covered Cause of Loss.

**1.      Covered Property**

Covered Property, as used in this policy, means the type of property described in Paragraph A.1., and limited in Paragraph A.2. Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

a.      Building, meaning buildings and structures including:

(1)      Completed additions;
(2)      Glass that is a part of a building or structure;
(3)      Fixtures, including outdoor fixtures;
(4)      Permanently installed:
        (a)      Machinery;
        (b)      Equipment;
        (c)      Platforms; and
        (d)      Bins;

(5)      Personal property owned by you that is used to maintain or service a building or structure or the "covered location", including:
        (a)      Fire extinguishing equipment;
        (b)      Outdoor furniture;
        (c)      Floor coverings;

> (d)     Heating, air conditioning and ventilation equipment; and
>
> (e)     Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;
>
> (6)     "Builders risk", if not covered by other insurance. With respect to fixtures, machinery and equipment subject to Paragraphs L.2.a.(2) and L.2.a.(3) of the definition of "builders risk", coverage under this provision also includes your legal liability for similar property belonging to others . . . .

[Doc. 28 at ¶ 6; Doc. 36 at ¶ 6; Doc. 28-1 at 109].

10.     The Policy defines "Builders risk" as:

> Buildings and structures while being constructed, altered or repaired at a "covered location" including:
>
> a.     The following property, provided such property is intended to be permanently located in or on a covered building:
> (1)     Your building materials and supplies used for construction;
> (2)     Fixtures and machinery; and
> (3)     Equipment used to service the building;
>
> b.     Foundations of a building or structure while in the course of construction;
> c.     Temporary structures built or assembled on site, including cribbing, scaffolding and construction forms; and
> d.     Building materials and supplies that are:
> (1)     Owned by others;
> (2)     In your care, custody or control; and
> (3)     Located in or on a covered building or within 1,000 feet of a covered building.

[Doc. 28 at ¶ 6; Doc. 36 at ¶ 6; Doc. 28-1 at 150].

11.     The Policy also contains an endorsement titled "Windstorm or Hail Percentage Deductible" (the "Endorsement"). In relevant part, the Endorsement provides that:

The Windstorm Or Hail Deductible, as shown in the Schedule, applies to loss or damage to Covered Property caused directly or indirectly by windstorm or hail, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage. If loss or damage from a covered weather condition other than windstorm or hail occurs, and that loss or damage would not have occurred but for windstorm or hail, such loss or damage shall be considered to be caused by windstorm or hail and therefore part of the windstorm or hail occurrence.

With respect to Covered Property at a location identified in the Schedule, no other deductible applies to Windstorm or Hail.

The Windstorm Or Hail Deductible applies whenever there is an occurrence of windstorm or hail.

[Doc. 28 at ¶ 14; Doc. 36 at ¶ 14; Doc. 28-1 at 161].

12.    The Endorsement's "Windstorm or Hail Deductible Clause" provides that:

A.    All Policies

1.    A Deductible is calculated separately for, and applies separately to:
a.    Each building, if two or more buildings sustain loss or damage;
b.    The building and to personal property in that building, if both sustain loss or damage;
c.    Personal property at each building, if personal property at two or more buildings sustains loss or damage;
d.    Personal property in the open (or in a vehicle). . . .

C.    Calculation Of The Deductible – Blanket Insurance

In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to 1%, 2% or 5% (as shown in the Schedule) of the value(s) of the property that has sustained loss or damage.

[Doc. 28 at ¶ 14; Doc. 36 at ¶ 14; Doc. 28-1 at 161–62].

13.    The "Schedule" referenced in the Endorsement indicates that the deductible

percentage may be 1%, 2%, or 5%, but it does not show what percentage should apply

to the Covered Property under this Policy. Instead, it provides that "[i]nformation required

to complete this Schedule, if not shown above, will be shown in the Declarations." [Doc. 28 at ¶ 7; Doc. 36 at ¶ 7; Doc. 28-1 at 161].

14.    The Policy's Commercial Property Schedule indicates that the "Windstorm or Hail Deductible Percentage" for Views 1 is 2%, with a deductible of $440,000:[1]

**COMMERCIAL PROPERTY SCHEDULE**

Policy Number: ACP   COPA 3100463843          Policy  Period:  From **01/01/23**  To  **01/01/24**

Named Insured: ELEPHANT HOLDINGS INC

|  |  |  |  |
|---|---|---|---|

**** Premise No  06  **** Total Premium $   34,286.00

          Address: 11800 RIDGE PKWY
          City: BROOMFIELD          State: CO          Zip Code: 80021-6525

Description: BUILDING OWNER - LRO

Optional Coverage: Flood Coverage - Limit: $  5,000,000  Premium $      686.00
          Flood Coverage Aggregate Limit: $  5,000,000

| FORM | DATE | PREM | FORM | DATE | PREM | FORM | DATE | PREM |
|------|------|------|------|------|------|------|------|------|
| ILN020 | 0903 | 0 | IL0169 | 0907 | 0 | IL0228 | 0907 | 0 |
| OPDS03 | 0413 | 0 | OP1211 | 1010 | 0 | OP1004 | 0413 | 0 |

                    **  Building No  01  **  Total Premium $   33,600.00

Occupancy Group - APART & CONDOS
Description: THE VIEWS I
Construction Type: NON-COMBUSTIBLE

| FORM | DATE | PREM | FORM | DATE | PREM | FORM | DATE | PREM |
|------|------|------|------|------|------|------|------|------|
| OP0307 | 1010 | 0 | | | | | | |

Coverages Provided

| Item | Coverage | Limit of Insurance | Causes of Loss Form | Coinsurance | Deductible | Premium |
|------|----------|--------------------|--------------------|-------------|-----------|---------|
| 01 | BUILDING | INCLUDED | SPECIAL | 100% | 25000 | 32,120.00 |

Description:BUILDING

Optional Coverages:
Windstorm or Hail Deductible Percentage          2% $    440,000
Earthquake Coverage -     $100,000 -  Deductible
Replacement Cost
Agreed Value          Expiration Date: 01/01/24
Flood coverage - deductible $    100,000

| FORM | DATE | PREM | FORM | DATE | PREM | FORM | DATE | PREM |
|------|------|------|------|------|------|------|------|------|
| OP1001 | 0413 | 0 | | | | | | |

---

[1] $440,000 is 2% of $22 million, the agreed value of the Building Coverage for Views 1.

[Doc. 28 at ¶ 8; Doc. 36 at ¶ 8; Doc. 28-1 at 59].

15.     The Commercial Property Schedule entry for Views 2 is substantially identical and lists the same "Windstorm or Hail Deductible Percentage" of 2%, with a calculated deductible of $440,000.  [Doc. 28 at ¶ 11; Doc. 36 at ¶ 11; Doc. 28-1 at 61].

16.     Because AMCO contends that the applicable deductible is $440,000, and that the value of the lost building materials does not exceed the deductible, AMCO has not issued any payments on Semaho's claim for the lost materials.  [Doc. 28 at ¶ 17; Doc. 36 at ¶ 17; Doc. 28-3 at 3–6].

## ANALYSIS

### I.     Plaintiff's Cross-Motion

Plaintiff's Cross-Motion seeks summary judgment on Plaintiff's breach of contract claim.  [Doc. 27].  Under Colorado law,[2] to prevail on a claim for breach of contract, the plaintiff must prove (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  Semaho contends that AMCO breached its coverage obligations under the Policy by failing to apply the correct deductible to Semaho's claim for the lost building materials.  The principal issue, then, is how to calculate the windstorm or hail deductible under the Endorsement.  Both sides agree that the deductible percentage is 2%, but disagree over the underlying value to which that 2% should be applied.  This dispute

---

[2] The Parties' briefing assumes that Colorado law applies and does not conduct a choice-of-law analysis.  [Doc. 27 at 4–5; Doc. 37 at 10].  The Court accordingly assumes that Colorado law governs the interpretation of the Policy.  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

stems from the Parties' competing interpretations of Part A of the Windstorm or Hail Deductible Clause, which states that "[a] Deductible is calculated separately for, and applies separately to: . . . Each building, if two or more buildings sustain loss or damage; . . . [or] Personal property in the open (or in a vehicle)."  [Doc. 28-1 at 161–2].  AMCO argues that the lost materials were part of the "building," so the deductible should be 2% of the value of the Building Coverage for Views 1; Semaho argues that the lost materials were "[p]ersonal property in the open," so the deductible should be 2% of the value of the materials.  [Doc. 27 at 5–9; Doc. 36 at 11–16].  Each side finds some support in the Policy.

### A.    Interpretation of Insurance Contracts

"An insurance policy's terms are construed according to principles of contract interpretation:  a court seeks to give effect to the intent and reasonable expectations of the parties."  *Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 388 F. Supp. 3d 1328, 1333 (D. Colo. 2019).  Under this approach, "courts should be wary of rewriting provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy."  *Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).  Courts "read the provisions of the policy as a whole, rather than reading them in isolation," *id.*, and "seek to give effect to all provisions so that none will be rendered meaningless," *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 933 (Colo. 1999) (quotation omitted).

If an insurance policy provision is ambiguous, then the policy is construed against the insurer and in favor of coverage.  *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 820 (Colo. 2004).  A provision is ambiguous if it is "susceptible to more than one reasonable interpretation."  *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 288

(Colo. 2005).  The mere fact that the parties disagree as to the meaning of insurance policy terms does not render the policy ambiguous.  *See Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 377 (Colo. 2000).  The interpretation of a contract is a question of law for the Court.  *Cary*, 108 P.3d at 290.

B.    **AMCO's Interpretation**

The Court begins with AMCO's interpretation of the Policy.  As set forth in AMCO's response brief as well as its own Cross-Motion, AMCO's position is that "[u]nder the Policy and Endorsement, the deductible is 2% of the value of the Covered Property, i.e., the Building."  [Doc. 28 at 11].  This argument relies on the Covered Property Provision and the Policy's definition of "Covered Property."  [*Id.* at 11–14; Doc. 37 at 11–16; Doc. 28-1 at 109].  That provision states that "Covered Property, as used in this policy, means the type of property described in Paragraph A.1."  [Doc. 28-1 at 109].  Paragraph A.1 lists the "Building" as one type of Covered Property:  "Building, meaning buildings and structures including: . . . 'Builders risk.'"  [*Id.*].  Because the lost building materials fall under "Builders risk,"[3] they qualify as part of the "Building" for purposes of the Policy's definition of "Covered Property."  [*Id.* at 109, 150]; *see also* [Doc. 27 at 6; Doc. 37 at 12 (both Parties asserting that the materials are covered under "Builders risk")].  AMCO contends that "[t]he materials are considered Covered Property only because they are part of the Building," so the scope of the term "Building" in the Covered Property Provision must define "building" for the remainder of the Policy, including the Endorsement.  [Doc. 28 at

---

[3] AMCO also suggests that the lost building materials may fall within the Building coverage as "[p]ersonal property owned by you that is used to maintain or service a building or structure or the 'covered location.'"  [Doc. 28 at 12].  The exact subsection of the Building coverage that applies to the building materials is immaterial to the Cross-Motions.

14; Doc. 37 at 13 (arguing that this case involves "interpretation of an insurance policy defining the term 'building'")].

AMCO also points to the Endorsement's Schedule, which provides that "Information required to complete this Schedule . . . will be shown in the Declarations." [Doc. 28 at 13; Doc. 28-1 at 161].  And the Commercial Property Schedule (which functions as the Declarations) provides that the windstorm or hail deductible percentage for Views 1 and Views 2 is 2%, with a total deductible of $440,000 for each—i.e., 2% of each building's agreed value of $22 million.  [Doc. 28 at 13–14; Doc. 37 at 14–16; Doc. 28-1 at 33, 59, 61].  Therefore, AMCO concludes, when the Endorsement explains that the deductible should be calculated using the "value(s) of the property that has sustained loss or damage," the relevant "property" is the entire "building" as defined in the Covered Property Provision.  [Doc. 37 at 14–15].  The lost building materials are only Covered Property because the Covered Property Provision treats them as part of the coverage on the "building," so they cannot be treated as separate "personal property" entitled to their own deductible under the Endorsement.  [*Id.*].

### C.    Semaho's Interpretation

Semaho counters that the Covered Property Provision's definition of "Covered Property" "is not a definition [of the word 'building'] but part of the coverage grant."  [Doc. 36 at 5–7].  In other words, the fact that the coverage on the "Building" includes certain types of personal property does not mean that every ensuing reference to the "building" also refers to those types of personal property.  [*Id.*].

Because the Covered Property Provision should not be read to define the term "building," Semaho urges the Court to interpret the Endorsement's terms using their plain

meaning and consistent with Colorado law. [Doc. 27 at 6–8]. Under Colorado law, Semaho argues, "building materials that have not yet been installed" are personal property, not part of the building. [*Id.* at 8 (citing *SDI, Inc. v. Pivotal Parker Com., LLC*, 339 P.3d 672, 677 (Colo. 2014) (defining "personal property" as "everything that is subject to ownership, tangible and intangible, that is not real property")) (further citation omitted)]. Therefore, when the Endorsement instructs that a "[d]eductible is calculated separately" for "[e]ach building, if two or more buildings sustain loss or damage" and for "[p]ersonal property in the open (or in a vehicle)," the lost building materials were personal property in the open, not part of the building. And the "property that has sustained loss or damage," as relevant to Semaho's claim for coverage, is the building materials, not Views 1 or Views 2. [*Id.* at 7 (quoting [Doc. 28-1 at 162])]. Semaho concludes that the deductible should be calculated as 2% of the value of the lost building materials. [*Id.* at 9–10].[4]

D.    **Discussion**

Under Colorado law, this Court looks not only to the language of the Policy but also to the Endorsement with the purpose of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Fed. Ins. Co.*, 734 F. App'x 586, 590 (10th Cir. 2018) (citing *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009)); *see also Gorsuch,*

---

[4] Semaho also claims that it submitted two claims to AMCO—one for the building itself and one for the lost materials—and the fact that AMCO treated these claims separately reinforces Semaho's point that the building and materials require separate deductible calculations. [Doc. 27 at 8–9]. But as AMCO points out in its Response, there is no evidence that Semaho submitted a claim for building damage to AMCO. [Doc. 37 at 14]. Semaho does not respond to this point in its Reply. *See* [Doc. 43]. "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones*, 366 F.3d at 875. Accordingly, in deciding the Cross-Motions, the Court does not consider Semaho's unsupported allegations.

*Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014) ("If an agreement is contained in multiple documents, courts construe those documents together."). Applying the relevant principles of contract interpretation, this Court cannot find that the Policy and the Endorsement are unambiguous under either Party's interpretation.

AMCO's interpretation is appealing because it appears to comport with the plain language of the Covered Property Provision. The Covered Property Provision explains that "Covered Property, as used in this policy, means the type of property described in Paragraph A.1.," and that the "Building, meaning buildings and structures including[] . . . 'Builders risk,'" is one such "type of property." [Doc. 28-1 at 109]. Because "Building" includes "Builders risk" for purposes of determining what is Covered Property, the argument goes, the same must be true when the Endorsement and other Policy provisions use the term "building."

But it is not clear to the Court that the Covered Property Provision should be understood to define "building" for the Endorsement and the rest of the Policy. Accepting the Covered Property Provision as a Policy-wide definition of the word "building" would mean interpreting "building" to include various forms of personal property, such as building materials, fire extinguishing equipment, and outdoor furniture. [*Id.* at 109, 150]. That interpretation defies the plain meaning of the word "building," which is "a usually roofed and walled structure built for permanent use." *Building*, Merriam Webster, https://www.merriam-webster.com/dictionary/building (last visited Sept. 30, 2025); *see also Building*, Black's Law Dictionary (12th ed. 2024) ("A structure with walls and a roof, esp. a permanent structure"). And the Court must give the "words contained in the

contract their plain and ordinary meaning, *unless contrary intent is evidenced in the policy*." *Cyprus*, 74 P.3d at 299 (emphasis added).  Upon review of the Covered Property Provision, the Endorsement, and the Policy as a whole, the Court is respectfully unpersuaded that treating the Covered Property Provision as defining the word "building"—rather than simply prescribing the scope of coverage—is the only reasonable way to read the Policy.

To start, none of the various tools the Policy uses to indicate a specially defined term are present with respect to "Building."  For instance, the Policy begins its definition of Covered Property with the phrase "Covered Property, as used in this policy, means . . . ."  [Doc. 28-1 at 109].  The Policy then capitalizes "Covered Property" in subsequent provisions.  *See, e.g.*, [*id.* at 161].  The Policy does not capitalize "building" in the relevant provisions of the Endorsement.  [*Id.*].  Nor does the Endorsement place the term in quotation marks, as it does for some important terms.  *See, e.g.*, [*id.* ("As used in this endorsement, the terms 'specific insurance' and 'blanket insurance' have the following meanings: . . . .")].  The Covered Property Provision does not introduce its explanation of the "Building" coverage with the signal phrase "as used in this policy," as it does for Covered Property.  [*Id.* at 109].  And the Policy omits the term "building" from its "Definitions" section.  [*Id.* at 149–53].  The Policy's failure to use these signals implies that the "Building" subsection of the Covered Property Provision sets out the scope of the Building coverage, not a definition for the word "building" to be used in the Endorsement and the rest of the Policy.

The Endorsement itself does not indicate that its use of the words "building" and "personal property" should be interpreted according to anything other than their plain

meaning.  To be sure, the Endorsement applies only "[w]ith respect to Covered Property at a location identified in the Schedule"—it is not a freestanding grant of coverage.  [*Id*. at 161].  But the Endorsement does not tie its use of the term "building" to the Covered Property Provision.  Rather, it simply states that where there is damage to a "building" or "[p]ersonal property in the open," the "Calculation of the Deductible" should be performed using "value(s) of the property that has sustained loss or damage."  [*Id*. at 162].[5]  If the term "building" always included all the categories contained within the Covered Property Provision, there would be no need to calculate and apply a separate deductible to "[t]he building and to personal property in that building" in the case of Windstorm and Hail damage—it would always be 2% of the building value, i.e., $440,000.  *Compare* [*id*. at 109], *with* [*id*. at 161–62].  AMCO seems to contend that the Endorsement's distinction between the building and its associated personal property should only apply if Semaho had purchased coverage for business personal property.[6]  [Doc. 37 at 14–15].  But the Endorsement does not suggest that its terms are conditioned on the type of coverage purchased, and Colorado law disfavors rewriting the Endorsement to include such a requirement.  *See Cyprus*, 74 P.3d at 299.

---

[5] Nor is the Court persuaded by AMCO's argument that "[a] deductible loses its meaning entirely if the amount is dependent upon factors outside the contemplation of the contract of insurance."  [Doc. 37 at 16].  For one, this policy argument cannot alter the text of the Policy.  Moreover, Example No. 2 in the Endorsement describes calculating separate deductibles for a building and the "personal property in that building" based on their respective values.  [Doc. 28-1 at 162].  AMCO may be correct that a preset deductible is often desirable, but the Endorsement plainly contemplates that a deductible will be "calculated separately" based on the value of the property that suffers the loss.  [*Id*. at 161–62].

[6] The Building coverage's inclusion of "[p]ersonal property owned by you that is used to maintain or service a building or structure," [Doc. 28-1 at 109], can reasonably be interpreted to include on-site building materials and supplies.

AMCO also asserts that Semaho's interpretation is unreasonable because it fails to consider the Policy as a whole. [Doc. 42 at 7]. But accepting AMCO's interpretation of the Covered Property Provision as a definition for the word "building" would also lead to illogical results in various other portions of the Policy. The Limitations provision, for example, states that AMCO will not pay for damage to "[t]he interior of any *building* or structure . . . caused by or resulting from rain, snow, sleet, ice, sand or dust . . . ." [Doc. 28-1 at 137 (emphasis added)]. The Additional Coverage – Collapse provision states that AMCO will pay for "direct physical loss of or damage to Covered Property, caused by abrupt collapse of a *building* or any part of a building . . . ." [*Id.* at 138 (emphasis added)]. The Party Walls subsection defines a "party wall" as "a wall that separates and is common to adjoining *buildings* that are owned by different parties." [*Id.* at 141 (emphasis added)]. And the "Builders risk" definition explains that "Builders risk" includes "[f]oundations of a *building* or structure while in the course of construction." [*Id.* at 150 (emphasis added)]. All of these provisions invoke the word "building" in terms of its plain meaning and would make little sense if "building" was also understood to refer to certain types of personal property within the scope of the Building coverage. *See Lister v. Am. United Life Ins. Co.*, 797 P.2d 832, 834 (Colo. App. 1990) ("In ascertaining whether certain provisions of an insurance contract are ambiguous, . . . reference must be made to all the provisions of the agreement."). Based on the Policy as a whole, Court cannot conclude that it would be unreasonable to interpret these terms according to their plain meaning.

However, Semaho's interpretation of the Policy also suffers from flaws that preclude the Court from finding that Semaho has identified the only reasonable interpretation of the Policy. For one, as explained above, the text of the Covered Property

Provision does imply that "Building" includes "Builders risk" for purposes of the Policy—it is not unreasonable for AMCO to presume that this applies to the calculation of the deductible.  And the Policy does not specifically define "personal property" to include building materials and supplies used for construction.  Nor will the Court ignore that the Commercial Property Schedule lists the windstorm or hail deductible for Views 1 and Views 2 as $440,000, connecting the listed deductible to the agreed value of each building.  [Doc. 28-1 at 33, 59, 60].  If the Court adopted AMCO's position, "the property that has sustained loss or damage" under the Endorsement would always be the building, thus harmonizing the listed deductible in the Commercial Property Schedule with the "Calculation of the Deductible" provision in the Endorsement.  Under Semaho's interpretation, the deductible listed in the Commercial Property Schedule would be meaningless whenever the damaged property was anything other than the building itself. *See Pub. Serv. Co.*, 986 P.2d at 933.

In short, "[b]oth interpretations are equally reasonable, but problematic." *Cary*, 103 P.3d at 292.  The Endorsement could be reasonably read either way:  the "property that has sustained the loss" could be the "building" or "personal property" within those terms' ordinary meaning, or it could be "Building" as described in the Covered Property Provision, such that the building is always the property that has sustained the loss when an insured submits a claim under the Building coverage. *See* [Doc. 28-1 at 161–62].  And neither Party offers admissible extrinsic evidence as to an unambiguous, harmonious interpretation of the Policy and Endorsement. *See Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 843 (Colo. App. 2011).  The Court accordingly finds that the Policy is "susceptible to more than one reasonable interpretation." *Cary*, 108 P.3d at 288.  In

such a situation, Colorado law requires that the ambiguities in the Policy be construed against AMCO and in favor of coverage. *See id.* at 290. Thus, the Endorsement's Windstorm or Hail Deductible must be calculated as 2% of the value of the lost building materials. Plaintiff's Cross-Motion is respectfully **GRANTED**, and summary judgment **SHALL ENTER** in Plaintiff's favor on the breach of contract claim.[7]

## II. Defendant's Cross-Motion

Defendant seeks summary judgment on all three of Plaintiff's claims. [Doc. 28]. Because the Court has granted summary judgment in Plaintiff's favor on the breach of contract claim, Defendant's Cross-Motion is respectfully **DENIED** as to Plaintiff's breach of contract claim. The Court thus focuses its analysis on the bad faith claims.

Colorado statutes impose certain obligations on insurance companies, instructing that insurers "shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." Colo. Rev. Stat. § 10-3-1115(1)(a). To succeed on a claim under this statute, an insured must establish that (1) the insurer delayed or denied payment of benefits to the insured, and (2) the delay or denial was without a reasonable basis. *See Am. Fam. Mut. Ins. Co. v. Barriga*, 418 P.3d 1181, 1185–86 (Colo. 2018). Insurers also have common law duties to deal in good faith with their insureds. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004). "The requirements of a common law bad faith claim under Colorado law are heightened in comparison to those of a statutory bad faith claim." *Butman Fam. Inv. Ltd. P'ship v. Owners Ins. Co.*, No. 19-cv-01638-KLM, 2020 WL 1470801, at *8 (D. Colo. Mar. 25,

---

[7] Although this ruling decides the issue of liability on the breach of contract claim, the Court notes that the measure of damages remains disputed. *See* [Doc. 27 at ¶ 8; Doc. 37 at ¶ 8].

2020).  In addition to demonstrating that the insurer delayed or denied benefits without a reasonable basis, "a common law insurance bad faith claim requires the insured to [prove] . . . that the insurer knowingly or recklessly disregarded the validity of the insured's claim." *Id.*

"The reasonableness of the insurer's conduct is determined objectively and is based on proof of industry standards."  *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 847 (Colo. 2018) (quotation omitted).  An insurer acts unreasonably when it acts "without a reasonable basis."  *Wagner v. Am. Family Mut. Ins. Co.*, 569 F. App'x 574, 579–80 (10th Cir. 2014) (applying Colorado law).  Typically, whether an insurance company acted reasonably in handling a claim for insurance benefits is a "question of fact for the jury." *Vaccaro v. Am. Fam. Ins. Grp.*, 275 P.3d 750, 759 (Colo. App. 2012).  But "in appropriate circumstances," such as "when there are no genuine issues of material fact, reasonableness may be decided as a matter of law."  *Id.*  Because the "standard for reasonableness [for a statutory bad faith claim] is the same as for a common law bad faith claim," the Court addresses the reasonableness prong of both bad faith claims together. *See Herrig v. Am. Fam. Mut. Ins. Co., S.I.*, No. 22-cv-00693-WJM-NRN, 2022 WL 17975483, at *3 (D. Colo. Dec. 28, 2022).

To the extent Semaho's bad faith claims rely on AMCO's failure to adopt Semaho's interpretation of the Policy, the claims fail as a matter of law.  As explained above, the Policy is ambiguous as to the calculation of the deductible under the Endorsement, and AMCO's interpretation of the relevant Policy provisions was reasonable.  Accordingly, when AMCO invoked that reasonable interpretation to deny coverage based on Semaho's competing understanding of the Policy, AMCO had a "reasonable basis" for doing so.

*See Avalon Condo. Ass'n, Inc. v. Secura Ins.*, No. 14-cv-00200-CMA-KMT, 2015 WL
5655528, at *5 (D. Colo. Sept. 25, 2015) ("An insurer does not act in bad faith where it
legitimately disputes the interpretation of an insurance policy." (quotation omitted)).

Semaho also fails to adduce competent evidence to avoid summary judgment on
its other theories of bad faith.  AMCO's Cross-Motion asserts that "[t]here is no dispute
that AMCO conducted a timely and reasonable investigation of Plaintiff's claim.  AMCO
considered all available facts and data, then reasonably applied the facts to the terms of
the Policy to reach a conclusion."  [Doc. 28 at 17].  The burden is thus on Semaho to "set
forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at
250 (quotation omitted).  But Semaho fails to respond with any such facts.  First, Semaho
contends that "the adjuster did not appear to actually consider the arguments posed by
Semaho for how the deductible should be calculated but merely reiterated that the
building deductible applied."  [Doc. 36 at 14].  Semaho apparently believes that AMCO's
letter setting out AMCO's interpretation of the Policy, [Doc. 36-2], failed to sufficiently
credit Semaho's earlier letter explaining its own interpretation, [Doc. 36-1].  But AMCO's
letter confirms that AMCO was "in receipt of" Semaho's letter before providing a
counterargument.  [Doc. 36-2 at 1].  Other than speculating as to AMCO's adjuster's
mental state, Semaho does not explain what more AMCO should have done.

Second, Semaho asserts that "AMCO failed to pay at least the difference between
the value of the lost roofing materials and the $440,000 deductible, without any apparent
basis let alone one that was reasonable."  [Doc. 36 at 14–15].  This assertion is
contradicted by the record.  Both Semaho and AMCO provided their own estimates for
the value of the lost materials. *Compare* [Doc. 27-7], *with* [Doc. 28-3].  Semaho does not

even acknowledge AMCO's competing valuation, much less explain why the valuation was unreasonable.  In any case, "[u]nreasonable conduct cannot be established by virtue of a mere disagreement of value between the insured and insurer, and it is not sufficient for an insured to simply tender a different valuation of the claim."  *Yale Condos. Homeowner's Ass'n, Inc. v. Am. Fam. Mut. Ins. Co., S.I.*, No. 19-cv-02477-KMT, 2021 WL 1222518, at *7 (D. Colo. Apr. 1, 2021) (cleaned up).  Semaho's cursory argument fails to provide any evidence or authority demonstrating why this theory of bad faith is anything more than a valuation dispute.

Third, Semaho contends that "if the uninstalled roofing materials were to be considered part of the Views I building, it was at least arguably unreasonable for AMCO to then treat the two claims as separate rather than as a single claim for damage to Views I that was subject to a single $440,000 deductible."  [Doc. 36 at 15].  As explained above, the assertion that Semaho submitted two claims to AMCO is unsupported by the record. *See supra* note 4.

Finally, Semaho claims that "[i]t is not inconceivable that Semaho could uncover evidence in discovery" that might create a genuine issue of fact.  [Doc. 36 at 15].  This is speculative and insufficient to avoid summary judgment.  *Bones*, 366 F.3d at 875.  The Parties do agree that discovery in this case remains incomplete.  [Doc. 36 at 15; Doc. 42 at 9]; *see also* [Doc. 46].  But Plaintiff's summary-judgment burden does not change merely because discovery is unfinished.[8]  And Rule 56 does not require that "summary

---

[8] Rule 56(d) provides the appropriate mechanism for a nonmovant to request additional time for discovery.  *See* Fed. R. Civ. P. 56(d).  But "Rule [56(d)] does not operate automatically.  Its protections must be invoked and can be applied only if a party satisfies certain requirements."  *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) (addressing Rule 56(f), the previous version of Rule 56(d)).  Foremost among those

judgment not be entered until discovery is complete." *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 784 (10th Cir. 2000) (quotation omitted). Because Plaintiff fails to present competent evidence demonstrating a genuine issue of fact as to whether AMCO unreasonably denied or delayed benefits or otherwise acted in bad faith, Plaintiff's bad faith claims fail as a matter of law. Accordingly, Defendant's Cross-Motion is respectfully **GRANTED** as to Plaintiff's common law and statutory bad faith claims.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Plaintiff's Cross-Motion is **GRANTED**;

(2)   Defendant's Cross-Motion is **GRANTED in part** and **DENIED in part**;

(3)   Summary judgment is **GRANTED** in favor of Plaintiff on Plaintiff's breach of contract claim as to liability only;

(4)   Summary judgment is **GRANTED** in favor of Defendant on Plaintiff's statutory and common law bad faith claims;

(5)   Given the limited scope of the dispute in light of the Court's ruling, the Parties shall **MEET and CONFER** about alternative dispute resolution and **FILE** a Joint Status Report about their efforts to resolve this action without further court action no later than **November 3, 2025**; and

---

requirements is that the nonmovant must "show[] by affidavit or declaration" that it is entitled to relief under Rule 56(d). Fed. R. Civ. P. 56(d); *see also Price*, 232 F.3d at 783 (reiterating that a sufficient affidavit is a "prerequisite" to relief under Rule 56(d)). Here, Plaintiff has neither invoked Rule 56(d) nor submitted any affidavit or declaration.

(6)   A Telephonic Status Conference is **SET** for **November 10, 2025 at 1:30 p.m.**

Counsel for the Parties shall participate using the following dial-in information:

571-353-2301; Access Code: 783456374.


DATED:  September 30, 2025                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge